[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[MEMORANDUM OF DECISION]
On November 2, 1992 and December 7, 1992, the Petitioner, the Commissioner of Children and Youth Services (now known as the Department of Children and Families and hereinafter referred to as "DCF") filed petitions seeking to terminate the parental rights of the respondent mother and the respondent father respectively, regarding the minor child, Chase M. Both petitions for termination were based on the following statutory ground:
 (1) Section 17a-122(b)(2): The parent of a child who [had] been found by the superior court to have been neglected or uncared for in a prior proceeding [has] failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, [he and/or she] could assume a responsible position in the life of the child.
The right to terminate parental rights generally is codified in Section 17a-112 et seq. of the Connecticut General Statutes. Specifically, Section 17a-112(b) states in part:
 The superior court, upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be CT Page 4411 less than one year.
Our state courts have recognized that "t is both a fundamental right and the policy of this state to maintain the integrity of the family." [In re Juvenile Appeal (83-CD)],189 Conn. 276. ". . . [C]onsideration of the best interest of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination." [In reBarbara J.], 215 Conn. 31 (1990). A compliance with this statutory procedure is not inconsistent with concern for the best interest of the child. [In re Juvenile Appeal (Anonymous)]177 Conn. 672 (1979) See [In re Jessica M.], 217 Conn. 459
(1991), for a recent discussion of the termination of parental rights with attendant authority.
[I. PROCEDURAL BACKGROUND]
According to the termination petition filed by DCF, the minor Chase M. was born on June 22, 1991. No evidence was produced to the contrary. At the time of the completion of trial in this matter, he was two years, seven months old. On November 8, 1991, when Chase M. was four and a-half months old, DCF filed a Neglect Petition in his behalf against respondent mother and respondent father, alleging that Chase was being denied proper care and attention physically and emotionally and that Chase was being permitted to live under conditions, circumstances or associations injurious to his well being. On November 8, 1991, an Order of Temporary Custody ("OTC") was signed by the Court (Teller, J.). On November 19, 1991, both parents waived the ten-day statutory time period, and the Court ordered the OTC to stay in effect until further order of the Court. On April 27, 1992, both respondent parents entered pleas of nolo contendere to the Neglect Petition. The Court (Teller, J.) adjudicated Chase neglected, and Chase was committed to the care and custody of DCF for a period of time not to exceed eighteen months.
On July 27, 1993, DCF filed a Petition for Extension of Commitment for a period not to exceed eighteen months stating that the respondent parents had not fulfilled the Court's expectations regarding therapy and visitation nor had they demonstrated changes which would enable them to provide a safe, stable or secure home for Chase. Respondent mother was in agreement with the requested extension; respondent father objected to it. On September 14, 1993, the Court (Handy, J.) CT Page 4412 granted the extension, effective October 27, 1993 and to expire on April 27, 1995.
As previously stated, DCF filed a Petition for Termination of Parental Rights (hereinafter "TPR") against both respondents on August 31, 1992. Those petitions were dismissed by the Court (Silbert, J.) for lack of service. DCF then filed a TPR petition against the respondent mother on November 2, 1992. Service was made on respondent mother in person in court on December 8, 1992. DCF filed the same TPR against the respondent father on December 7, 1992. Service was made on respondent father by publication in the New London Day on December 30, 1992. Proforma denials were entered on behalf of both respondent parents on January 26, 1993.
Trial on the TPRs commenced on November 1, 1993, and continued on November 19, November 22, December 13 and December 17, 1993. Further trial dates were held on January 3, 1994, January 14, 1994, and trial completed on January 24, 1994.
[II. BURDEN OF PROOF AND STATUTORY PROCEDURE]
With regard to "termination of parental rights", that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of such child or the religious affiliation of such child". See Connecticut General Statutes § 18a-93(e) and § 45a-707(g). Termination of parental rights is a judicial matter of exceptional gravity and sensitivity. [Anonymous v. Norton], 168 Conn. 421, 430 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." [Stanley v. Illinois], 405 U.S. 645, 651 (1972); [In re JuvenileAppeal (Anonymous)], 177 Conn. 648, 671 (1979).
Both the child and the parent (s) have a constitutionally protected interest in the integrity of the family. [Santosky v. Kramer], 455 U.S. 75 (1982). The rights of parents to the custody of their children is an important CT Page 4413 principle that has constitutional dimensions. [In re JuvenileAppeal], 187 Conn. 431, 435 (1982).
The constitutional guaranty of due process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing evidence", not merely a fair preponderance of the evidence. [Santosky v. Kramer], supra. Both Connecticut General Statutes § 17a-112(b) and Connecticut Practice Book § 1049, as amended, mandate the standard of proof as "clear and convincing evidence". [In re Juvenile Appeal (84-3)], 1 Conn. App. 463
(1984).
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing or the last amendment, by clear and convincing evidence. [In re Theresa S.], 196 Conn. 18 (1985). (See also Connecticut General Statutes § 17a-112(b) and Practice Book § 1099.) Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC),194 Conn. 252 (1985); In re Nicolina T., 9 Conn. App. 598 (1987).
Termination of parental rights proceeds in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. [In re JuvenileAppeal (84-AB)], 192 Conn. 254, 269 (1984); [In re Nicolina T., supra at 602; In re Luke G.], 40 Conn. Sup. 316, 324 (1985). Establishment of one or more of the statutory grounds is a mandatory prerequisite to the dispositive stage: an inquiry regarding the ultimate best interests of the child. Section17a-112(b) of the Connecticut General Statutes sets forth the statutory grounds for termination. Since the language is set out in the disjunctive, as previously stated, one ground only need be established for the granting of the petition. Section17a-112(d) of the Connecticut General Statutes sets out the specific findings a court must make to determine that termination of parental rights is in the child's best interest.
[III. FINDINGS OF FACT]
At trial, the petitioner introduced testimony and exhibits through the following witnesses: Diane Carberry, staff and charge nurse at Lawrence Memorial Hospital; Dr. Timothy J. CT Page 4414 Sullivan, pediatrician at Backus Hospital; Andrea McGill-O'Rourke, Director of Social Services at Backus Hospital; Marilyn Williams, support worker and former intake worker for DCF; Officer Garth Perry of the Norwich Police Department; Angela Beckerman, former counselor at the Care Clinic; Officer Joseph Clark III of the Town of Groton Police Department; Investigator William T. Molis, Jr. of the Norwich Police Department; Officer (Barber) Dolan of the Norwich Police Department; Officer Louis Diamanti of the Stonington Police Department; Sarah (Savin) Wilhelm, an investigative social worker for DCF; Sully H. a friend of respondent mother; Patricia M. a DCF licensed foster mother and currently Chase's foster mother; Officer Elizabeth Smith of the Ledyard Police Department; Dr. Bruce Freedman, psychologist; Officer Donald Holloway of the Town of Groton Police Department; Lynette M. Anderson, social worker at the Child and Family Agency; Dawn J. mother of the respondent mother in this case; Jane George, social worker for DCF; and Theodore Aniskoff.
Both respondents and counsel for the minor child, Chase M., presented exhibits through witnesses called by the petitioner. No other party called any witnesses.
The petitioner's first three witnesses, all hospital personnel, Diane Carberry, R.N.; Dr. Timothy J. Sullivan; and Andrea McGill-O'Rourke, testified as to incidents which predated the neglect adjudication in this case which occurred on April 27, 1992. While that testimony cannot be utilized to determine whether or not the petitioner has proven by clear and convincing evidence the ground alleged in the respective TPR, the testimony is helpful in aiding this Court to understand the petitioner's concerns as to what respondents needed to accomplish in terms of rehabilitation. These witnesses related two incidents in which Chase had been injured: an abrasion, contusion and hematoma to the right side of the scalp when he was 43 days old and a skull fracture at four months old which Dr. Sullivan characterized as "unlikely to be caused" in the manner in which respondent further explained. Respondents' respective abilities to keep Chase safe was of paramount concern to DCF post-neglect adjudication.
Marilyn Williams, an intake worker at DCF, investigated the case after Chase's first injury on August 6, 1991, and spoke directly with both respondents. Again, this incident was pre-neglect adjudication but is helpful to the CT Page 4415 Court for purposes of background regarding DCF's concerns. Issues surfaced at that time regarding respondent father's alleged alcoholism and respondent mother's change of story as to the specific incident which initiated the DCF referral.
Sarah (Savin) Wilhelm, a former DCF intake worker, investigated the case after Chase's second injury in October of 1991. Ms. Wilhelm spoke with and extensively interviewed each respondent. While this incident was also pre-neglect adjudication, it is important in terms of informing the Court as to what services DCF began to put in place to address its concerns with the respondents' parenting skills. Ms. Wilhelm testified that at the end of her investigation, she worked with the respondents to provide services preserving unification of the family unit. An in-home intensive family preservation plan was put in place with someone in the respondents' home 12 to 20 hours a week with the intent of servicing the family intact. Respondent mother and respondent father were in agreement with all the goals, and according to Ms. Wilhelm, agreed to cooperate with the DCF worker. A treatment plan was put in place (Exhibit, Child's 1) which required the respondents to cooperate with DCF and the Norwich Youth Services Bureau, deal with substance abuse and resolve mother's issues of the "battered woman" Ms. Wilhelm also noted in her testimony that the respondents' versions of both the August and October, 1991, incidents were inconsistent. She concluded by stating that the services were put in place for the respondents in conjunction with the filing of the neglect petition. Ms. Wilhelm personally set up all services, put them in place and made sure they were accessible to the respondent parents.
DCF called a number of police officers and one private citizen to testify regarding various incidents of alleged domestic violence. once [Once] again, even though the events testified predated the neglect petition, the collective testimony was presented by the petitioner to illustrate DCF's ongoing concern about a history of physical violence between the respondents which put Chase at risk. Officer Joseph Clark III and Officer Donald Holloway of the Town of Groton Police Department testified that they responded to the home of respondent mother and respondent father on an incident of alleged domestic violence in March of 1991. (Exhibit, Petitioner's 13). Respondent father was placed under arrest. Officers William T. Molis, Jr., Garth Perry and (Barber) Dolan of the Norwich Police Department testified that they responded to a November 4, 1991 CT Page 4416 incident of domestic violence between the respondents in which respondent father was arrested. (Exhibit, Petitioner's 7) officer Elizabeth Smith of the Town of Ledyard Police Department testified about her investigation of a domestic dispute between the respondents in late May of 1992. Respondent father was arrested as a result of this investigation. (Exhibit, Petitioner's 10). Officer Louis Diamanti of the Stonington Police Department investigated a July 19, 1992 incident which had been reported and witnessed by a private citizen who also testified, Mr. Theodore Aniskoff. (Exhibit, Petitioner's 9) Mr. Aniskoff testified that he witnessed the respondent mother being beat up by a man while she sat in a parking lot in a pickup truck that was later identified as belonging to respondent father. Mr. Aniskoff was able to identify respondent mother at trial as the victim of the beating he witnessed. The respondent father was not present during the trial.
The respondent father's counselor, Ms. Angela Beckerman, testified that she first met with him in later November, 1991, for evaluation and intake. He had been referred to Ms. Beckerman through the Family Reservation Unit at DCF. Ms. Beckerman made two recommendations: (1) individual counseling, one time per week; and (2) when the respondent father was out of denial regarding his alcoholism, group sessions (i.e. Alcoholics Anonymous) three times per week. The therapist summarized that respondent father made four out of eight sessions, having four "no shows", his last "no show" on January 28, 1992. Based on his lack of attendance, he was automatically discharged from the program. Ms. Beckerman advised that father contacted her in July of 1992, stating he wanted to return to treatment but he did not want therapy information shared with anyone. Several days later, he cancelled his appointment, stating he did not have the financial means to afford the sessions. Ms. Beckerman told him she would see about getting some financial assistance for him and confidentiality would have to be breached if she was subpoenaed. Respondent father never contacted Ms. Beckerman again.
Ms. Lynette M. Anderson, respondent mother's therapist, testified that mother was a family violence referral who she first saw on November 27, 1991. Ms. Anderson stated that she did discuss objectives with mother which included the goal of returning Chase to his parents; working on the poor relationship between her and respondent father; and strengthening the bond between her and Chase. Mother needed to CT Page 4417 protect herself from father so that she could protect Chase and she needed to learn that much of Chase's behavior was developmentally normal. Ms. Anderson further stated that respondent mother did not make much progress in her relationship with respondent father; there were nine separate times between January, 1992 and November, 1992, when mother separated from and then reunited with father. Ms. Anderson felt mother refused to give up on the relationship despite the fact that it posed a threat to her safety and could work against her efforts to reunify with Chase.
There was initially some progress in mother's ability to better understand Chase's behavior, but her therapist testified that this progress deteriorated in July of 1992 and had not improved in the fall of 1992. Ms. Anderson continued to work with mother in December of 1992 stressing the need for family therapy and mother's need for life skills. Therapy ended in mid-December of 1993 subsequent to Ms. Anderson's characterization of mother's continual placement of father's interests ahead of Chase's interests. Prior to that date, Ms. Anderson stated that after February of 1992, her goal with mother changed, excluding father from any reunification. Mother told her she had left respondent father; therefore, respondent mother's therapeutic goals were rewritten in April of 1992, excluding father from family reunification with Chase. Respondent father was not notified of this goal change as Ms. Anderson felt he was not her client. In sum, Ms. Anderson felt that even though mother attended therapy regularly, there was no significant progress. Mother had not changed her feelings toward father yet she never told Ms. Anderson in April of 1992 that she disagreed with a revised goal of unification with Chase without respondent father. Ms. Anderson felt that Chase should have a permanent and stable plan and stated that even if father "was not in the picture", she was unsure mother would keep Chase safe; she "never saw her stick with anything".
The respondent mother's own mother, Dawn J., testified that her daughter had dated respondent father since 1990 but she had never directly observed any physical confrontation between them. She stated that her daughter had had her take her home on several occasions, did attempt to get her into the Women's Center, did observe a black eye on her daughter one time, and felt her daughter was terrified of respondent father. The maternal grandmother did offer and continue to offer her home as a place for respondent mother and Chase to live. Chase did live CT Page 4418 there when he was first born. Dawn J. has also supervised visitation between her daughter and grandson, but this has been difficult to schedule because she works two jobs and the foster mother told her she could not visit at night because Chase went to bed at 6 p.m. Maternal grandmother stated that mother has worked steadily over the past year and one-half. She did not know if mother had seen father recently but thought father had moved to North Carolina.
Sally H. a friend of respondent mother, testified that she had known mother for ten years and known father for approximately the same time period. She stated that respondent mother confided in her that she and father began a relationship in the fall of 1990, which quickly deteriorated into verbal abuse and in February of 1991, into physical abuse, two incidents of which (3/91 and 6/91) she personally observed. She also stated that she saw bruises on mother or mother told her about bruises she had sustained three to four times per month between February of 1991 until respondent father left for North Carolina. In March of 1992, Ms. H. offered for mother to come live with her and her husband in Virginia until she "got on her feet and got a job". She stated respondent mother did not follow through with this even though she initially was very receptive to the idea. She did state that she has never personally observed mother parent Chase but mother has expressed affection for Chase to her. Ms. H. admitted that mother had told her on numerous occasions that she would not reunite with father and then did. Ms. H. testified that now she believes respondent mother's intent not to reunify with respondent father: his influence is out of her life; she is rebuilding her confidence and self esteem; and she wants to provide a home for her child.
Chase's current DCF licensed foster mother, Patricia M. testified. She had Chase in placement originally in November of 1991 for about a week and one-half; he was returned to her care August 26, 1992 and remains there today. Foster mother stated that in August of 1992, she did meet with respondent father; he initially visited Chase Sunday mornings from 9 to 10 a.m., and he complied with that schedule for five or six weeks. She commented that his parenting skills were excellent while he was with Chase, and he never showed up under the influence of drugs or alcohol. In October of 1992, respondent father stopped visits; foster mother testified that he had a "variety of excuses" for doing so. She reported that CT Page 4419 he later told her that he and mother would never get Chase back with him "in the picture" and he would "step aside" until mother got Chase back.
Foster mother stated that respondent mother visited with Chase approximately three times a week; this plan had been in effect for some time. Foster mother reported that mother was in compliance with this visitation schedule until November of 1992. She did feel, however, that respondent mother did not have good parenting skills; during her visits, she needed to be encouraged to participate in Chase's care. In November of 1992, through the end of July 1993, visits were infrequent: initially, once every two weeks and then once every four to five weeks. Approximately one month before commencement of trial, respondent mother telephoned foster mother and recommenced her scheduled visitation three times per week. Foster mother testified that mother told her that court was starting and she needed to start regular visits again. Foster mother stated that she and the respondent mother would talk during visitation; mother spoke often of respondent father; told foster mother she would be together with him forever; and told her she did not need counseling as she had not hurt Chase. Recent visits have been better. Mother tends to spend more of each visit (approximately 15 minutes) with Chase and the remainder of the visit talking with foster mother and watching Chase. Foster mother stated that she knew mother was not supposed to be with father, but on several occasions, he drove her to visits. Sometimes mother brought other friends of hers to visits with her. Since December, 1992, respondent mother also allowed one six-hour visit every three weeks supervised by maternal grandmother. Mother has utilized this privilege six times; as maternal grandmother testified, she works two jobs and this visitation is difficult to arrange.
Finally, foster mother stated she is in favor of mother being reunified with Chase if father is not involved in reunification. She also stated that on one occasion, she had been contacted by Ms. George from DCF and told not to allow mother or father to visit with Chase until both had contacted DCF. When mother contacted foster mother two weeks later to set up visitation, foster mother told her to call Ms. George prior to her next visit. It does not appear mother missed any visitation with Chase despite this procedure.
Dr. Bruce Freedman had been court appointed to CT Page 4420 psychologically evaluate both respondents and Chase He did so for purposes of the neglect petition in December of 1991 (Exhibit, Petitioner's 11) and in March of 1993 for purposes of the termination petition. (Exhibit, Petitioner's 12) Dr. Freedman's first evaluation was pre-neglect adjudication but can be used to assist the Court in a comparison of the doctor's concerns in December of 1991 and in March of 1993. In December of 1991, Dr. Freedman's initial concern was that mother did not learn from her mistakes; there was a great deal of domestic violence, and mother continually put her boyfriend (respondent father) ahead of Chase, not taking sensible actions to protect Chase. Dr. Freedman articulated a second concern: he did not see a bond between mother and Chase. He set up a six to nine month timeframe to determine whether or not Chase should be reunited with mother. He testified that the amount of time was based on the child's age at the time of placement and with the recognized opinion in the field that there should be permanency within one to one and one-half years to avoid serious personality disorders later. Finally, his initial evaluation recommended:
 Assuming the parents or Karen make substantial improvements over the next 6-9 months, then consideration might be given to returning the baby to the care of one or both of them. However, if they fail to make such progress, eventually this will require the senior [paternal grandparents] to decide whether they wish to continue their parenting on a long-term basic (sic) or look for other long-term resource. Basic conditions for return of the baby would have to include at least: reliable sobriety for James with AA attendance or other ongoing program. Completion of domestic violence classes and absence of domestic violence incidents, and satisfactory progress or completion of personal counseling.
Dr. Freedman completed a second evaluation in March of 1993. He stated that respondent mother's bond with Chase had weakened further since his first evaluation, and the child viewed her as a distant relative. He also felt Chase had brief interest in respondent father but not much of a relationship or bond with him. Chase did not want to be left alone with father CT Page 4421 and regarded him as a stranger. In sum, Dr. Freedman testified that at the time of the second evaluation, both respondents had all the same problems they had at the time of the first evaluation and that these problems had in fact worsened. Dr. Freedman felt neither parent had done anything to substantially work toward reunification with Chase. Dr. Freedman recommended termination as follows:
 It is therefore recommended that parental rights be terminated for Chase in order to allow adoption and a permanent home to be secured for him. The parents were currently in basically the same condition as when first seen by this psychologist, with 15 months having passed, while the parents were presumably under the "pressure" of having their child committed, with maximum motivation to change assumed for them.
 Only by termination of parental rights would Chase's future be secured for him. In contrast to a future of chaotic home life, with substance abuse, domestic violence, criminal behavior, and repeated disruptions, Chase would have a better chance in this manner for a normal life. He had made a solid attachment to his foster mother, and in this or other healthy home, he would be more likely to develop into a healthy, productive adult.
Dr. Freedman also emphasized that even if father were not in Chase's or mother's life, he would still recommend termination of both respondents' parental rights. He stated respondent mother was not a competent parent; he had serious concerns about her adult functions and her ability to establish proper priorities.
Dr. Freedman admitted that respondent father had a gentle manner with Chase and showed good parenting skills while in the doctor's presence, but father's sobriety would take a long time. Father might prove to be a visiting resource for Chase; he would be "an excellent playmate for the child" He emphatically stated that father had an opportunity to rehabilitate and failed to do so. In his testimony, Freedman CT Page 4422 concluded that respondent mother suffered from Battered Women's Syndrome which would require a couple of years of counseling, and she suffered from an inadequate personality disorder which prevented her from acting independently and making decisions for herself. He stated that Chase's chance of having an effective parent was better with a stranger than with respondent mother. Mother had the ultimate motivation — the child's removal from her — and this still did not motivate her to correct her problems. Dr. Freedman felt mother made an "adequate caretaker" but not a "competent caretaker" He conceded that respondent father had sought some treatment for his alcohol problem, but Freedman felt that father's effort was solely to comply with other requirements for other criminal charges and he exhibited no "conscientious after care" He stated father's efforts were "token"; he pursued treatment when he thought it would help him with some short-term good but his behavior was always the same before treatment and after treatment". As to mother, Dr. Freedman did not feel that she had a bond with Chase or vice versa, Chase recognized her and interacted with her as he would "any other relative".
DCF's last witness, Jane George, a DCF treatment social worker, testified that she became involved with this family in October of 1991. She initially met with the family at the time that the family preservation unit which was acceptable to parents was put in place in respondents' home. The family preservation unit worked with respondents from October 24, 1991 through November 5, during which time there were two incidents involving respondent father's use of alcohol and subsequent domestic violence. On that day, mother entered into a service agreement with Ms. George which stated that mother would remain at a shelter, allow no contact between Chase and father, cooperate with the shelter and its services, and maintain daily contact with DCF. Two days later, mother wanted to leave the shelter and place Chase with his paternal grandparents. DCF filed an OTC, and at the hearing on November 12, 1991, additional service agreements were drawn between DCF and mother, father, paternal grandparents and maternal grandmother. (Exhibit, Petitioner's 16 A, E, J, K and L). Chase was placed shortly after the OTC with his paternal grandparents who became specially licensed through DCF.
Over the course of a number of meetings with respondent mother between November 13, 1991 and October 7, 1992, Ms. George stated that mother returned to and separated from CT Page 4423 father on six or seven different occasions. Mother told Ms. George that Chase came first, but she continued to reunify with respondent father. In February of 1992, Ms. George advised mother that continued contact with father would result in DCF filing a TPR. A neglect adjudication was entered by the Court (Teller, J.) on April 27, 1992 and expectations were signed at that time. (Exhibits, Petitioner's 1 and 3) In May of 1992, while father was at Boneski Treatment Center, mother considered Katie Blair House, a supportive living environment program, but preferred and interviewed at Thames House, a similar program for mothers and children. DCF would not give mother a reference for Thames House; DCF felt mother needed independent living without Chase first.
In August of 1992, Ms. George met with father, he signed a service agreement (Exhibit, Petitioner's 1), and she provided him with names of therapists. At that time, father also told Ms. George that his parents had allowed him unsupervised visitation with Chase. Initial TPRs were filed in August of 1992, but later dismissed by the Court for lack of service on either parent. A second TPR petition was filed in November of 1992 as to mother and a third TPR petition was filed in December of 1992 as to father. Ms. George testified that the TPR petitions were filed at that time based on Dr. Freedman's December 1991 evaluation which recommended a six to nine month rehabilitation period for the respondents prior to a permanency plan being made for Chase. Ms. George stated that DCF was still attempting reunification, even at the time the TPR petitions were filed.
In November of 1992, Ms. George unilaterally suspended both parents' visitation was Chase. She claimed there had been an incident of violence that she wanted to talk to the respondents about prior to further visitation with Chase. She also needed the respondents' respective addresses. She conceded that the violence allegations had not occurred in Chase's presence, had not put the child at risk, and had nothing to do with visitation. Mother entered into another service agreement December 2, 1992. (Exhibit, Petitioner's 15) The purpose of this agreement was to limit mother's contact with respondent father. Ms. George stated that subsequent to the execution of this agreement, mother visited Chase less often and terminated her therapy with Lynn Anderson. Respondent father contacted DCF in late December but left no telephone number. In March of 1993, after being released from jail, father again called DCF CT Page 4424 and requested visitation with Chase; visitation was arranged but father failed to show up. In mid-March, Ms. George was told that the respondents were again cohabiting. In June of 1993, father called DCF to arrange visitation, which was again set up; father did not show. Father, however, signed the March, 1993 service agreement and was given another one in July of 1993, when he had an office visit at DCF. At that time, father was in AIC and claimed he was trying to get counseling for himself and mother. In September, 1993, father called Ms. George and told her he had separated from mother and was living with his sister in North Carolina. Mother confirmed this separation to Ms. George, and in mid-September, 1993, and again in mid-October, 1993, Ms. George advised her to reconvene therapy and continue to work toward reunification even though a TPR had been filed.
Ms. George admitted that in November of 1991, respondent father was cooperating with Family Preservation and going to A.A.; from December, 1991 through February, 1992, he had supervised visitation with Chase which went appropriately; he attended Boneski Treatment Center in the spring of 1992; in July of 1992, he contacted the Care Clinic; although he did not follow through with that program as he claimed he could not afford it and he would not provide requested releases to the clinic; and he had attended the AIC regularly for three months and had no positive urines. Ms. George conceded that no visitation had been set up between father and Chase while father was incarcerated; this was DCF's policy. Further, she conceded that as of February 1992, DCF's goal was not reunification of the family as a whole, and subsequent to that date, no services were provided to the family as a unit.
Ms. George conceded that the worker from the Family Preservation Unit had told her, after the fact, that filing an OTC three weeks after the implementation of Family Preservation "was not a good idea". DCF would not give mother a reference for Thames House; Ms. George believed it was not appropriate for mother, yet she never checked the program out in any detail. Despite the fact that the Court (Teller, J.) ordered DCF to visit with Chase once a month while the child was in foster care, she had only seen him seven times in 1992 and four times (at home) in 1993. Ms. George also admitted that when the TPR as to mother was filed in November of 1992, reunification between mother and Chase was probably not viable, but DCF would still work with her. In February of 1992, and for a period of time thereafter, Chase was not transported to mother's therapy CT Page 4425 sessions with Ms. Anderson. At the time the neglect adjudication was made and at the time the TPR was filed, mother was in ongoing counseling with Ms. Anderson. In sum, Ms. George conceded that DCF would continue to encourage the parents to accept appropriate services and cooperate with those services but DCF never felt cooperation would stop the pending TPRs.
Ms. George admitted that aside from the Family Preservation Program and the Family Violence Program, offered in the fall of 1991 and February of 1992 respectively, no other services were provided to or offered to the respondents as a family unit. She admitted that no services were offered to mother at the time the TPRs were filed as DCF thought that reunification was not possible at that time.
[IV. TERMINATION RE: CHASE M.]
A. [Waiver of the One Year Requirement]
Connecticut General Statutes § 17a-112(c) provides for the waiver of the one year requirement and states:
 The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child.
Determination of the question of a waiver is within the trial court's discretion. [In re Romance M.], 30 Conn. App. 839 (1993).
On April 27, 1992, Chase M. was adjudicated neglected. A TPR as to respondent mother was filed on November 2, 1992, approximately six and one-half months post-neglect adjudication and as to respondent father on December 7, 1992, approximately seven and one-half months post-neglect adjudication. It should be noted that DCF had originally filed TPRs on August 27, 1992 on both respondent parents. Both were dismissed by the Court since service was not effectuated on either respondent. DCF claims that the August filings were based on Dr. Bruce Freedman's, the court-appointed psychologist's, December 11, 1991 evaluation which recommended within six to nine months, if the parents had not made substantial progress toward rehabilitation, DCF should begin to make permanent plans for CT Page 4426 Chase. Further, DCF contends that the one year requirement was in fact met: DCF opened the file in October of 1991; proper service on the TPR on mother occurred in November, 1992, and proper service on the TPR on father occurred in December, 1992.
Respondent father argues that the one year period should not be waived, "especially where DCF deliberately denied him the opportunity to become more able to assume the responsibilities of parenting, by failing to take any affirmative steps to assist him". (Respondent Father's Brief at p. 5) Respondent mother similarly argues that DCF has not proven that based on the totality of the circumstances, a waiver of the one year rule is necessary to promote Chase's best interests. This Court adopts DCF's second argument, the one year statutory requirement was met, as analyzed in [In re Saba P.],13 Conn. App. 605 (1988). As the court stated:
 . . . We do not determine the statutory year as legally requiring any fixed starting date. The statutory requirement is, simply that, at the time of the adjudication, statutory grounds exist for the termination of parental rights, and that those grounds must have existed for not less than one year. The statute does not say `one year from the date of placement' or `one year from the date of commitment' [It requires only that the ground exist for not less than one year. This is so regardless of the status of the child. The child may be in placement, in commitment or still at home . . .] (Emphasis added.)
In the case before this Court, all parties agree that DCF originally opened a file in this matter in October of 1991. TPRs were not filed as to mother and father until November, 1992 and December, 1992, respectively. Consequently, in accord with [In re Saba P.], the [ground] existed for not less than one year prior to the TPR filing. Therefore, the statutory one year requirement was met by DCF, and this Court does not have to address the issue of a waiver of that one year period.
B. [As to Respondent Mother and Respondent Father]
The petitioner here has alleged as to both respondent CT Page 4427 parents one statutory ground: failure to rehabilitate. That ground is set out in § 17a-122(b)(2) of the Connecticut General Statutes: "The parent of a child who [had] been found by the superior court to have been neglected or uncared for in a prior proceeding [has] failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, [he and/or she] could assume a responsible position in the life of the child".
Personal rehabilitation means "the restoration of a parent to his or her constructive and useful role as a parent". [In re Migdalia M.], 6 Conn. App. 194, 203 (1986), cert. denied199 Conn. 809 (1986). In order to prove "failure to rehabilitate", the petitioner must show that the parents have failed to rehabilitate within a reasonable time so that they could assume a responsible position in their child's life. [Inre Rayna M.], 13 Conn. App. 23 (1987). The statute requires this Court to look at the level of the parents' rehabilitation as it relates to a particular child. [In re Luis C.], 210 Conn. 157,167 (1989). A parent need not be capable of assuming full responsibility for his or her child without the assistance of appropriate support services. Id. What constitutes a reasonable time period in which rehabilitation is effectuated is question of fact for the court. [In re Davon M.], 16 Conn. App. 693,695-6 (1988).
As previously documented, DCF opened a file on Chase M. on October 18, 1991. Chase M. was adjudicated neglected on April 27, 1992. Original TPR petitions were filed in August, 1992. Due to lack of service on either parent, the August petitions were subsequently dismissed. Respondent mother was successfully served with a new TPR in November of 1992 and respondent father was successfully served with a new TPR petition in December of 1992. Thus, a period of approximately 14 months elapsed between DCF's opening of the case and its effective service of TPR petitions on both respondents.
While a fourteen month time period would normally be a "reasonable time period" in which to rehabilitate, the facts of this case belie that assumption. Petitioner lists seven facts in its TPR petition upon which termination is sought:
 (1) Chase, born 6/22/91, was placed by DCYS under an Order of Temporary Custody on CT Page 4428 11/12/91. The baby had twice been injured while in the care of one or both parents, during his first four months of life. In addition, he had been assaulted in utero by his father and had been in the immediate presence of his parents during domestic violence episodes on at least three occasions.
 (2) Chase was committed to DCYS as a neglected child on 4/2/7/92 and has remained in care since that time.
 (3) Mother has attended weekly therapy ten months, but has failed to recognize the need to isolate herself and her baby from father's violence. Mother has continued to associate with father despite ongoing physical violence and despite her awareness of his continuing involvement in criminal activities. She has allowed the baby to be in father's presence on an unsupervised basis.
 (4) Mother has not complied with a court expectation set on 4/27/92 that she participate in a supportive-living-environment program.
 (5) Mother has demonstrated marked lack of interaction with the baby during supervised visits in the foster home.
 (6) Father completed treatment at the Boneski Substance Abuse Treatment Center on 7/7/92. Since that time, he has been arrested twice: on 7/19/92, for breach of peace following a violent argument with mother; and on 7/26/92, for possession of cocaine.
 (7) Violence has continued between mother and father, the most recent incident occurring on or about 11/17/92. CT Page 4429
The Court will address each of these alleged facts individually to determine whether or not DCF has proven by clear and convincing evidence, based on these seven alleged facts, that either or both respondent mother and/or respondent father has failed to rehabilitate.
 (1) Chase, born 6/22/91, was placed by DCYS under an Order of Temporary Custody on 11/12/91. The baby had twice been injured while in the care of one or both parents, during his first four months of life. In addition, he had been assaulted in utero by his father and had been in the immediate presence of his parents during domestic violence episodes on at least three occasions.
No party disagreed that Chase was twice injured while in the care of one or both parents. These injuries, however, were sustained prior to DCF's decision to leave Chase in the home with his parents and the support of an Intensive Family Preservation social worker. As petitioner's brief notes, "the parents were totally cooperative with DCF and its recommendations for treatment" (Petitioner's Brief at p. 5) Despite this cooperation and despite a contrary recommendation from the respondents' Intensive Family Preservation social worker, Bill Eyeberse, the DCF treatment worker, June George, filed an OTC with an appended neglect petition on November 8, 1991, only three weeks after the implementation of the Intensive Family Preservation Program. Petitioner alleges and evidence supported that this filing followed domestic violence between mother and father, for which father was arrested. No party denied the November incident or arrest. There is no evidence in the record that Chase was in any way harmed during this November incident. Consequently, this Court questions whether DCF gave the respondents adequate time to work with the program and their social worker prior to terminating the program.
 (2) Chase was committed to DCYS as a neglected child on 4/27/92 and has remained in care since that time.
This Court's file reflects a neglect adjudication on April 27, 1992, and testimony reflects that Chase has been in foster care since that time. CT Page 4430
 (3) Mother has attended weekly therapy ten months, but has failed to recognize the need to isolate herself and her baby from father's violence. Mother has continued to associate with father despite ongoing physical violence and despite her awareness of his continuing involvement in criminal activities. She has allowed the baby to be in father's presence on an unsupervised basis.
DCF's major concern with respondent mother was her continued contact with respondent father and her alleged failure to isolate herself and Chase from father's violence. While this was a legitimate concern, DCF did nothing after terminating the Intensive Family Preservation Program to work with reunification of the family unit. In fact, Ms. George testified at trial that in February of 1992, the best chance for reunification was respondent mother with Chase and only if mother completely severed her relationship with father. DCF's decision [predated] a neglect adjudication by two months and was almost six months prior to the filing of the first TPR petitions. Ms. George further admitted that both mother and father did attend the Family Violence Program from November, 1991 through February, 1992. Respondent father stopped going in February, 1992, the same time DCF determined that reunification as a family would. not be possible. This determination was made despite the fact that both respondent mother [and respondent father] has cooperated with DCF from October of 1991 through February of 1992. Respondent mother then attended individual therapy with Lynette Anderson from February of 1992 through February of 1993.
When asked what services DCF offered to the respondents as a family unit, post-February, 1992, the response was "none". When asked what services DCF offered to respondent mother subsequent to her termination with Ms. Anderson in February of 1993, the response was that DCF sent mother a list of agencies [in September of 1993] where she could obtain counseling. There was no evidence of any services offered to mother between February of 1993 and September of 1993. It is true that this time period followed the filing of the TPR, but Ms. George continually stated at trial that it is DCF's policy to continue services after a TPR is filed and continue to work toward reunification. When asked what services DCF offered to CT Page 4431 respondent father subsequent to February of 1992, the response was that father was given a list of therapists, and in May of 1993, was sent a notice about parenting classes. There is no evidence in the record that he ever received the notice.
 (4) Mother has not complied with a court expectation set on 4/27/92 that she participate in a supportive-living-environment program.
Evidence at trial showed that there were two supportive-living-environment programs available: Katie Blair House which DCF supported and would not allow mother to be with Chase and Thames House which mother and her therapist supported which would allow mother to be with Chase. Ms. George refused to give mother a recommendation for Thames House, as she felt it was inappropriate for respondent mother and child. Yet, on cross examination, Ms. George admitted that she did not check into the program at all; she did not know what protection there would have been for mother and child; based on what "she had heard", she felt that the program was not appropriate. Clearly, there was a difference of opinion: mother wanted a program which allowed her to be with her child; DCF wanted a program in which mother would participate on her own.
 (5) Mother has demonstrated marked lack of interaction with the baby during supervised visits in the foster home.
Chase was placed with Patricia M. for a very brief period of time after the OTC was granted, then placed with paternal grandparents for a lengthy period of time until they moved out of state in August of 1992, and then placed back with Ms. M. since late summer, 1992, to the present time. Ms. M. did testify that if the Court terminates parental rights in this case, she would like to adopt Chase. Ms. M. provided most of the information regarding mother's interaction with Chase, but those observations would have had to relate to instances after the TPR was filed. Any interaction which mother had with Chase prior to the TPR would have been at father's parents, who, until August of 1992, were the foster parents. At no time did Ms. George, the treatment case worker, personally observe mother and child interacting. Testimony shows that mother made attempts to bond and interact with Chase. She attended therapy with Lynette Anderson for over a year and CT Page 4432 brought Chase with her to many of those sessions, until DCF prohibited her from transporting him herself. She sought out and investigated Thames House, a supportive living program recommended by her therapist, which would have allowed her to live with Chase, but DCF would not provide her with the needed recommendation. She visited Chase regularly until November of 1992 when her visits became more infrequent through July of 1993. Since that time, she has been regularly visiting once again. Testimony indicated that mother's parenting skills were lax; she did not fully understand what child care entailed. But there is no evidence before this Court that mother cannot learn these skills with the proper parenting classes offered. Ms. M. testified that in recent visits, mother spends more time with Chase and that her visits are "better than the past"; she has more self esteem. Mother also successfully completed three six-hour visits outside foster mother's home, with her own mother supervising the visits. Maternal grandmother testified that her daughter had not had more extended visits because of maternal grandmother's work schedule, (she was working two jobs).
 (6) Father completed treatment at the Boneski Substance Abuse Treatment Center on 7/7/92. Since that time, he has been arrested twice: on 7/19/92, for breach of peace following a violent argument with mother; and on 7/26/92, for possession of cocaine.
In July, 1992, father successfully completed treatment at Boneski Substance Abuse Treatment Center. (Exhibit, Father's S) Father called Angela Beckerman of the Care Clinic to resume counseling as a follow-up to his Boneski discharge. It is true that he never continued counseling due to his problems with lack of confidentiality and an issue of finances. However, DCF offered respondent father little, if nothing, in terms of additional avenues to pursue nor offered any encouragement for attempts at family reunification even if he attended counseling. Finally, there was no evidence before the Court that father's subsequent arrests led to conviction or that either of them directly placed Chase at harm.
 (7) Violence has continued between mother and father, the most recent incident occurring on or about 11/17/92. CT Page 4433
Ms. George testified that there was an incident of domestic violence between respondents in November of 1992. She referred to it as an "allegation of violence". No other testimony or evidence substantiated that the incident took place. Based on that allegation, however, Ms. George called foster mother and told her not to allow either respondent mother or respondent father to visit until each had contacted DCF. This unilateral suspension of visitation was implemented despite the fact that the alleged violence had nothing to do with Chase or with visitation.
The petitioner has not proven by clear and convincing evidence that either mother or father has failed to achieve such a degree of rehabilitation as would encourage the belief that either parent or both parents can assume a responsible position in the life of their son, Chase, within a reasonable period of time. DCF is mandated in all cases to take unilateral action either [to reunify families] or to terminate parental rights as expeditiously as possible for purposes of providing children with permanency and stability. [In re Juvenile Appeal (83-CD)],189 Conn. 276, 292 (1983). In the instant case, very limited efforts were made for family reunification and DCF had already decided in February of 1992, two months before any neglect adjudication, and only four months after the case file was opened, that family reunification would not be the goal. This decision was made despite evidence that mother and father had cooperated with the intensive Family Preservation Program and attended the Family Violence Program for four months. It was made despite the fact that mother and father initially visited regularly with Chase, showed appropriate behavior while visiting, and father exhibited good parenting skills.
Once DCF made the decision not to reunify the whole family, it admitted at trial that it provided no family services to respondent. This Court recognizes that there are domestic violence issues which are prevalent in this case and there are concerns about both respondents', especially mother's, parenting skills. Whether or not this family can reunify as a family unit or whether Chase can be reunited with either parent separately is highly questionable. that [That] question cannot be answered, however, until services are offered to respondents for family reunification and/or parenting skills. Whether or not either or both respondents choose to avail herself/himself of the services cannot be determined until the services have actually been CT Page 4434 provided.
[V. BEST INTERESTS]
"Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after [the] statutory grounds for termination of parental rights [relied on in the petition] have been established by clear and convincing evidence". In re Kelly S., 29 Conn. App. 600,617 (1992), citing In re Valerie D., 223 Conn. 492, 511
(1992). In the case at bar, the petitioner has not established, by clear and convincing evidence, the statutory ground alleged in the TPR petition. On that basis, this Court need not consider and make findings on the criteria set out in § 17a-112(d) of the Connecticut General Statutes, as amended.
[VI. CONCLUSION]
The petitions seeking the termination of respondent mother's and respondent father's parental rights with respect to Chase are denied. Custody of Chase will remain with the Department of Children and Families based on the April 27, 1992 adjudication of neglect entered by the court (Teller, J.), which was extended for eighteen months by the Court (Handy, J.), said extension effective October 27, 1993 to expire on April 27, 1995.
Handy, J.